THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


NATALIE ALPHONSE SULLIVAN, )
                           )
                           )
          Plaintiff;       )
                           )
     v.                    )          Case No. 1:20 – CV – 281
                           )               (Jury Trial Demanded)
WAKE FOREST UNIVERSITY HEALTH )
SCIENCES,                   )
WAKE FOREST UNIVERSITY BAPTIST )
MEDICAL CENTER,            )
                           )
                           )
                           )
                           )
                           )
          Defendants.      )
_____)


     NOW COMES, NATALIE ALPHONSE SULLIVAN, who complains of Defendants and alleges as follows:

## PRELIMINARY STATEMENT

   1.  Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981 to redress the discrimination she experienced because of her race and sex while employed as a resident at the Radiation Oncology Program at Wake Forest Baptist Medical Center ("Wake Forest").

   2.  After Plaintiff reported the discriminatory behavior to Human Resources, she experienced retaliation from leaders at the residency program, including Dr. Arthur Blackstock and Dr. Doris Brown.

1

3.  On April 29, 2019, Plaintiff submitted her claim to the Equal Employment Opportunity Commission (the "EEOC") (Charge No. 435-2019-00694). Plaintiff's charge was formalized by the EEOC Greensboro Local Office on May 6, 2019.

4.  On December 16, 2019, Plaintiff submitted a supplemental statement to the EEOC, responding to the claims made in Wake Forest's Position Statement.

5.  On December 31, 2019, the EEOC issued Plaintiff's Notice of Right to Sue. This complaint is filed within 90 days of Plaintiff's receipt of such Notice of Right to Sue.

6.  All conditions precedent to the filing of this suit have been satisfied.

## JURISDICTION

7.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the matters in controversy arise under the Constitution and laws of the United States.

8.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims took place in Forsyth County, North Carolina, which is in the Middle District of North Carolina.

## PARTIES

9.  Plaintiff Natalie Alphonse Sullivan is currently a resident of Columbus, Georgia. At the time of the events giving rise to this lawsuit, Plaintiff was a citizen and resident of Forsyth County, North Carolina. Plaintiff is an African American woman.

10. Defendant Wake Forest University Baptist Medical Center ("Wake Forest") is incorporated in the state of North Carolina. Wake Forest's principal place of business is: the Department of Legal Affairs, Medical Center Blvd Winston Salem, NC 27157. Its registered agent is J. McLain Wallace, Jr.

11. Defendant Wake Forest University Health Sciences is incorporated in the state of North Carolina. Its principal place of business is: Medical Center Boulevard, Winston-Salem NC 27157. Its registered agent is Morgan J. Reid.

## STATEMENT OF FACTS

12. On May 20, 2013, Plaintiff graduated from Wake Forest University School of Medicine. Plaintiff did not immediately begin residency immediately, however, because she had not "matched" with a residency program in either of the competitive specialties to which she applied.

13. One reason that Plaintiff did not match is because she and her husband, Dr. Rashad Sullivan ("Dr. Sullivan") used the process of "couples matching."

14. The process of couples matching is more competitive than regular matching because it requires that a program accept or reject two applicants, substantially reducing each applicant's chance of acceptance into a program.

15. Moreover, Plaintiff and her husband applied to programs in neurological surgery and orthopedic surgery which are known to be two of the most difficult residency specialties.

16. Instead, Plaintiff applied for a year-long internship at Wake Forest Baptist Health's General Surgery Department (the "General Surgery Department").

17. During the application process, Plaintiff provided the General Surgery Department with her transcripts from undergraduate and medical school. Plaintiff also submitted her USMLE Step exam scores.

18. After reviewing Plaintiff's professional and academic qualifications, the General Surgery Department offered Plaintiff an offer to intern from July 1, 2013 to June 30, 2014, which Plaintiff gladly accepted.

19. After successfully completing the internship, Plaintiff was admitted into Wake Forest's year-long Radiation Oncology Grant Fellowship in July 2014.

20. Throughout this period, Plaintiff consistently distinguished herself through the quality of her academic research and her presentation of work at a national conference.

21. In fact, Plaintiff's exceptional performance resulted in the Chairman of the Radiation Oncology Program (the "Program"), Dr. Arthur Blackstock (the

"Chairman") personally encouraging Plaintiff to apply for acceptance to the Program.

22. Dr. Michael Chan, the former director of the Program (the "Former Director"), was also impressed by Plaintiff's work, and wrote a letter of recommendation on her behalf.

23. Unlike Plaintiff's prior attempts to couples match with residency programs, Plaintiff's application to the Program allowed her to be assessed solely on her own merits.

24. After reviewing Plaintiff's academic and professional qualifications, the Program extended Plaintiff an offer of acceptance. Plaintiff joined the program as a PGY-2 resident on July 1, 2015.

25. From July 1, 2015 to June 30, 2016, Plaintiff satisfied all the Program's requirements for first year residents. Plaintiff's evaluations from her first year of residency contain no indication that her work was deemed unsatisfactory.

26. During this year, Dr. Brian Lally (one of the attending physicians in the Program) evaluated Plaintiff's performance. Dr. Lally stated that Plaintiff was "[v]ery hard worked. The patients were always telling me positive things about their interactions with her. Still needs to work on her knowledge base. But was very good for someone in the first rotation of residency."

27. Wake Forest's Graduate Medical Education Reappointment, Disciplinary Actions, Grievance and Due Process Policy (the "Policy") provides the proper procedure for the annual reappointment of each resident after an appraisal of that resident's performance.

28. The Policy mandates, "Each Resident shall be considered for reappointment on an annual basis. Each program is required to establish and maintain a process for evaluation of the academic performance and professional ethics of each Resident sufficient to permit annual appraisal. Each program shall maintain written documentation of Resident evaluations. It is the responsibility of the program and the Program Director to annually determine the suitability of each Resident for reappointment based upon institutional policies. This recommendation is made with the understanding that the recommended reappointment is contingent upon

4

satisfactory completion of the program's requirements for promotion within the current year of training."

29. Pursuant to this Policy, Plaintiff was reappointed to the Program for another year of residency after an appraisal of her academic and professional performance during her PGY-2 Year.

30. Unfortunately, Plaintiff began to perceive that she was experiencing discriminatory treatment from Dr. Doris Brown, the Program Director (the "Director") shortly after joining the Program.

31. For example, the Program Director frequently scrutinized Plaintiff's performance more highly than her Caucasian peers.

32. Upon information and belief, the Program Director offered one-on-one support to Plaintiff's Caucasian colleagues when their performance needed improvement. The Program Director did not extend the same offers of assistance to Plaintiff.

33. Faculty members also observed the Program Director treating Plaintiff in an openly hostile and unfair manner. In fact, Dr. Lally stated that the Program Director was treating Plaintiff unfairly.

34. On or about May 16, 2016, Plaintiff met with Dr. Mitch Sokolosky, the Associate Dean for Graduate Medical Education (the "Associate Dean").

35. Plaintiff expressed her concerns that the Program Director was treating her unfairly. Although Plaintiff did not overtly attribute this treatment to race or gender, the substance of the conversation made this causal connection evident.

36. Because Plaintiff feared retaliation from the Program Director, she requested that the conversation remain confidential at that time.

37. Upon information and belief, the attending physicians in the Program were notified of Plaintiff's concerns.

38. The Assistant Dean informed Dr. Karen Winkfield, an attending physician in the Program, that a "female resident in her department came to see [him] and

discuss concerns of unfair treatment." There were only two female residents in the Program at the time.

39. In the Fall of 2016, Plaintiff was separately approached by four individuals who expressed their concerns that the Program Director was targeting her and intended to prevent her from receiving a fair opportunity to complete the Program.

40. These individuals included the Former Program Director, who warned Plaintiff that he was "fearful of [the Program Director's] intentions," Dr. Michael Farris, Dr. Emory McTyre, and Dr. Brian Lally.

41. Between July 1, 2016 to June 30, 2017, Plaintiff successfully completed her second year of residency.

42. Since the residents must rotate all rotations twice, Plaintiff repeated rotations with the Program Director and Dr. Kathy Greven.

43. During her PGY-3 Year, Plaintiff experienced the normal struggles of a resident learning to master difficult subject matter. However, she continued to receive very positive feedback regarding performance as a whole.

44. On an evaluation issued on January 6, 2017, the Chairman wrote, "Dr. Sullivan is performing as expected for a PGY-3 resident."

45. On an evaluation issued on May 8, 2017, Dr. Winkfield wrote, "Natalie did an excellent job on a very challenging rotation… The rotation was extremely busy, but Natalie always showed up prepared and provided excellent patient care. I discussed with her the need to review more primary data in her learning."

46. On March 29, 2017, the Program Director advised that Plaintiff take advantage of certain academic resources available to residents, including the Employee Assistance Program and a mentor. Plaintiff followed the Program Director's suggestions.

47. Pursuant to the reappointment procedures mandated by the Policy, Plaintiff was reappointed for another year of residency following an appraisal of her academic and professional performance during her PGY-3 Year.

48. In June 2017, Plaintiff took maternity leave following the birth of her first child.

49. Upon returning to work, Plaintiff notified the Program Director that she needed to take breaks to pump breast milk during the workday.

50. Unfortunately, the Program Director retaliated against Plaintiff by falsely claiming that Plaintiff was "unprofessional" and "difficult to find" during the times that she was pumping breast milk.

51. Upon information and belief, the Program Director also attempted to interfere with Plaintiff's use of maternity leave by providing Plaintiff with misinformation regarding maternity leave.

52. On or about May 8, 2017, Plaintiff met with Dr. Kathy Greven and the Program Director to discuss their alleged concerns regarding aspects of Plaintiff's academic performance.

53. During this meeting, Plaintiff was singled out for engaging in certain behaviors that were common among the residents.

54. For example, the residents in the Program routinely used pocket summaries to supplement their knowledge while working in the clinic due to the size and weight of their textbooks. In fact, Plaintiff began utilizing this resource after being advised to do so by the other residents.

55. However, Dr. Greven and the Program Director falsely equated Plaintiff's use of these guides with complete reliance on them to the exclusion of her textbooks.

56. Upon information and belief, Plaintiff's Caucasian residents were not chastised for using this supplemental resource.

57. Dr. Greven and the Program Director also required that Plaintiff participate in mock oral examinations during rotations, and reassured Plaintiff that "all the residents were required to do these."

58. After speaking with the Caucasian residents, however, Plaintiff learned that she was the only resident whose performance was constantly assessed in this manner.

59. Notably, the attending physicians began to use mock oral examinations for the other residents after Plaintiff voiced her concerns regarding unequal treatment.

60. Moreover, Plaintiff noticed several other differences in the expectations for her performance and the performance of the other residents.

61. For example, Plaintiff was disciplined for being late, although Plaintiff was consistently the first resident to arrive to classes and rotations. Upon information and belief, Plaintiff's Caucasian peers were not disciplined for this behavior.

62. Plaintiff was also disciplined for her "lack of professionalism" because of her occasional use of her computer and phone for academic purposes. Upon information and belief, Plaintiff's Caucasian peers who routinely and openly used these devices during lectures did not receive the same discipline.

63. Moreover, when all the residents performed poorly on a test, Plaintiff's grade was singled out and distorted as exceptionally low, although she performed within the same range as her Caucasian peers.

64. On or about May 16, 2017, Plaintiff also notified the Chairman of her concerns regarding discriminatory treatment by the Program Director.

65. The Chairman told Plaintiff, "although you might feel like you have a target on your back" you should "keep your head down."

66. During Plaintiff's third year of residency, the Program Director withheld negative feedback regarding Plaintiff's performance until Plaintiff completed the rotation. This resulted in Plaintiff having to repeat a rotation that she may have been able to remedy earlier.

67. The Program Director also treated Plaintiff in an openly disrespectful manner.

68. On December 4, 2017, the residents were interacting with medical students who were interviewing for the Program.

69. Although the Program Director encouraged the other residents to actively engage the interviewees, she excluded Plaintiff from these interactions. Instead, the Program Director required that Plaintiff perform menial tasks in an isolated part of the room, including making good bags for the interviewees.

70. The Program Director did not exclude Plaintiff's Caucasian peers from this interaction, nor did she require that they perform demeaning tasks.

71. On January 22, 2018, the Program Director invited the other residents to participate in gynecologic brachytherapy procedures but excluded Plaintiff. This incident occurred after the Program Director claimed Plaintiff was deficient in gynecology.

72. On January 25, 2018, the Program Director informed Dr. Chan that she would recommend Plaintiff's dismissal from the program if Plaintiff did not pass her board examination.

73. Upon information and belief, the leaders of the Program had not taken this type of adverse action for other residents who did not pass their boards on the first try.

74. On or about January 30, 2018, Plaintiff met with the Associate Dean to discuss the Program Director's discriminatory behavior. The Associate Dean informed Plaintiff he would discuss the issue with the Chairman and Program Director.

75. On February 7, 2018, Plaintiff met with the Chairman and Dr. Winkfield to discuss her concerns that she would be unfairly withdrawn from the Program.

76. During this meeting, the Chairman stated, "we are not going to kick you out of this residency. You are going to finish. I have been telling you that the whole damn time."

77. The Chairman also informed Plaintiff that once she finished her second year of residency, the leaders in the Program were committed to providing her with the

same chance to finish that was afforded to other residents who reached this milestone.

78. The Chairman said he was "not sure if torturing you on your way out of here was what someone has in mind, but you are going to pass. You are going to finish."

79. During this meeting, Dr. Winkfield questioned why Plaintiff was required to remediate a rotation with Dr. Frizell since he had personally informed Dr. Winkfield that Plaintiff's performance had been "great".

80. On February 21, 2018, the Program Director accused Plaintiff of failing to perform her clinical duties; this was later proven to be untrue.

81. On September 14, 2018, Plaintiff's husband ("Dr. Sullivan") met with Dr. David McIntosh, the Chief Diversity and Inclusion Officer for Wake Forest Baptist Health (the "Diversity Officer").

82. Prior to this meeting, Dr. Sullivan had informed the Diversity Officer of his concerns that the Program Director was discriminating against Plaintiff on the basis of her race.

83. The Diversity Officer informed Dr. Sullivan that an internal cultural survey had provided evidence of similar problems within the Program's department.

84. The Diversity Officer also advised that Plaintiff should report the discrimination to Human Resources to prompt an investigation into the matter.

85. Dr. Sullivan informed the Diversity Officer that Plaintiff was afraid that she would experience retaliation if she came forward since she had observed similar discriminatory behavior towards another minority physician, Dr. Nevine Hanna.

86. On October 11, 2018, Dr. Sullivan met with the Diversity Officer again at his request.

87. The Diversity Officer informed Dr. Sullivan said that he had discussed Plaintiff's concerns regarding discrimination and retaliation with Wake Forest's

Case 1:20-cv-00281-LCB-JLW    Document 1    Filed 03/30/20    Page 10 of 24

legal counsel, the Assistant Dean, Marie Claire Obrien and Todd Redding (the Associate Vice President of Human Resources).

88. According to the Vice President of Human Resources, Wake Forest's legal counsel expressed deep concern that the actions taken against Plaintiff were illegal.

89. The Vice President of Human Resources renewed his request that Plaintiff report the discriminatory behavior. He also asked if Plaintiff would speak with Human Resources if they contacted her under the guise of a general investigation.

90. Less than two weeks after this meeting, Human Resources reached out to Plaintiff and requested that she discuss her experience in the Program.

91. On October 26, 2018, Plaintiff met with Human Resources to discuss her concerns regarding the Program Director's discriminatory actions.

92. After this meeting, Plaintiff received a letter from Human Resources. Although the letter did not claim that Plaintiff's unequal treatment was due to race or gender, it confirmed Plaintiff's claim that she had been treated differently than other residents and offered no alternative explanation.

93. On November 28, 2018, Plaintiff and Dr. Sullivan met with Dr. Winkfield who advised Plaintiff against meeting with the Program Director alone.

94. Dr. Winkfield also inquired about Plaintiff's future plans, stating "from what it sounds like you are not going to get a fair shake here, so what are you going to do?"

95. On December 5, 2018, the Chairman met with Human Resources. After this meeting, the Chairman, Program Director, and Dr. Kathy Greven, an attending physician in the Program, placed Plaintiff on a six-month Formal Remediation Plan (the "Plan").

96. Prior to this date, Plaintiff had received no notice of significant concerns regarding her ability to practice independently.

97. Upon information and belief, Plaintiff was given substantially less time to remediate than is generally provided to similarly situated residents.

11

98. Upon information and belief, residents are generally given six months or more to make necessary changes before being place on a remediation plan. However, Plaintiff was given three weeks, which is approximately 12.5% of this amount of time.

99. There were several other problems with the implementation of the Plan.

100. For example, the Plan stated that Plaintiff "failed to satisfactorily progress in educational program" which contradicted the objective evidence provided in Plaintiff's evaluations from several years.

101. Under the Policy, the leaders of the Program had a duty not to reappoint Plaintiff to another year of residency unless she was deemed to have mastered the subject matter for the previous year.

102. Notably, ACGME guidelines require mid-rotation evaluations, which Plaintiff did not receive from the Program Director during any of the rotations with her, even after requesting them numerous times.

103. Upon information and belief, the Program Director willingly withheld feedback that in order to prejudice Plaintiff's performance in the Program.

104. The Plan also stated Plaintiff had "deficiencies in patient care competencies – gynecological cancers, lymphoma, breast cancer".

105. However, the second remediation plan implemented by the Program's leadership (which was put in place after Plaintiff successfully appealed her dismissal from the Program) assessed Plaintiff's knowledge in only 1 of these 3 areas.

106. Upon information and belief, the subject matter in Plaintiff's remediation Plan would not have been altered if Plaintiff was deemed to be deficient in those subjects.

107.     The Plan stated that Plaintiff had the following deficits in professionalism— tardiness, didactic attendance, learner engagement, leaving tasks early, often absent from clinical work areas and difficult to locate.

108.     Upon information and belief, other residents engaged in these behaviors without receiving the same level of discipline as Plaintiff.

109.     Moreover, Plaintiff was pumping breast milk during the period that she was deemed "absent" and "difficult to find".

110.     During Plaintiff's period of remediation, she was consistently told that she was making satisfactory progress and meeting expectations during her check in meetings (there were 2-4 per month).

111.     However, on March 5, 2019, Plaintiff received a Notice of Deficiency (the "Notice") from the Program Director and Assistant Dean informing Plaintiff that she was ineligible to complete the Program because she failed to successfully remediate.

112.     According to the Notice, this determination was based on: (1) problems with Plaintiff's performance during her years as a resident and (2) Plaintiff's failure to successfully remediate certain clinical experience.

113.     Notably, this determination was made halfway through the six-month remediation period.

114.     Prior to receiving the determination, Plaintiff had received positive feedback regarding her performance during the remediation plan.

115.     Although Plaintiff had been told that her performance in "professionalism" was progressing well during the remediation period, it was cited among the reasons she failed to remediate.

116.     After Plaintiff received the Notice, she asked the Assistant Dean about her appeal rights and was told that she could not appeal the decision.

117.     Upon information and belief, the Assistant Dean was aware of Plaintiff's due process rights as a resident. In fact, his signature is at the top of the Policy which state that residents can appeal these decisions.

118.     After seeking advice from legal counsel, Plaintiff was informed of her right to appeal the decision, which she exercised in a timely manner.

119.     On March 23, 2019, Plaintiff met with Todd Redding, who works in Wake Forest's Human Resource Department. Plaintiff informed Mr. Redding that she was being treated differently and unfairly and said the difference in treatment between the scrutiny imposed on Plaintiff and her Caucasian co-resident was "night and day".

120.     After the implementation of the Plan, Plaintiff began to communicate with other residency programs, including the Radiation Oncology Program at Oregon Health and Science University (the "Oregon Program"). Plaintiff wanted to transfer out of the Program because she was concerned that she would not be granted a full and fair opportunity to remediate.

121.     In April 2019, Plaintiff flew out to the Oregon Program for a mock oral session as part of the interview process.

122.     Plaintiff's knowledge of Head, Neck, Skin, and Gynecology was assessed through mock oral examinations, and she scored in the top quartile of interviewees. Notably, these are the subject areas that Plaintiff had allegedly failed to remediate.

123.     As a result of Plaintiff's exceptional performance, the Oregon Program extended an oral invitation to Plaintiff, which she accepted. At the time the offer was extended, the Oregon Program was aware that Plaintiff was on a remediation plan and was willing to provide Plaintiff the opportunity to remediate.

124.     Upon information and belief, the Chairman learned that Plaintiff had interviewed at the Oregon Program and contacted its Chairman, Dr. Charles Thomas.

125.    The Chairman told Dr. Thomas that Plaintiff was "difficult" because she complained to Human Resources.  Afterward, the Oregon Program rescinded its offer of admission.

126.    Plaintiff was notified of this conversation by that program's Vice Chairman, Dr. Jerry Jaboin, who had discussed the matter with Dr. Thomas. Dr. Jaboin also warned Plaintiff that the Chairman appeared to be misleading her.

127.    During this time, the Chairman also told Plaintiff that "none of this would have happened" if she had not expressed her concerns to Human Resources.

128.    On April 24, 2019, the Program Director wrote a Summative Evaluation Letter, mischaracterizing Plaintiff's performance as a resident.

129.    The Letter claimed that Plaintiff had failed to successfully complete her third, fourth and fifth years of residency – although she received positive evaluations during these years and had been reappointed to successive years of residency pursuant to Wake Forest's own, established policies.

130.    The Letter also asserted that during Plaintiff's PGY-5 Year, Plaintiff failed to successfully remediate Head, Neck & Skin and Gynecology, although Plaintiff scored in the top quartile during her interview in the Oregon Program in this subject matter.

131.    Notably, the Assistant Vice Chairman of the Oregon Program praised Plaintiff's mastery of this subject matter. When asked about Plaintiff's performance, Dr. Jaboin wrote, "[s]he was solid. Did well on H&N Especially for having more than a year before the oral boards!"

132.    The Letter also mischaracterized Plaintiff's PGY-4 Year, falsely stating "[Plaintiff] was placed on a written action plan to remediate deficiencies in medical knowledge. Actions taken were tutoring sessions in physics and radiation biology."

133.    In fact, Plaintiff was not placed on a written action plan by the Program during her PGY-4 year. Instead, Plaintiff independently sought counsel from the Former Program Director and requested tutoring from Dr. Elain Zeman in order to maximize her performance.

134.     The Letter failed to mention that it is common for residents to request tutoring from Dr. Zeman, especially during the years that the formal radiation biology course is not offered. This course was not offered during Plaintiff's PGY-4 year.

135.     Upon information and belief, other residents suffered no adverse action for independently seeking additional counseling or tutoring during the years that the formal radiation biology course was not offered.

136.     The Letter also contained other serious errors, including violations of ACGME rules and inadequate data to uphold conclusory statements about Plaintiff's alleged deficiencies.

137.     The Letter stated, "[i]n addition, due to difficulty with physics/radiation biology and clinical didactics, our program does not feel that she is ready to practice independently at this time. As part of the radiation biology course, we take periodic examination to assess learning."

138.     Upon information and belief, Plaintiff's scores did not reflect ongoing difficulty with radiation biology and there had been no recent assessment of her performance in physics at the time the Letter was released.

139.     The Letter also asserted that Plaintiff's mastery of certain areas has not been determined and implied that this may affect Plaintiff's ability to receive the necessary evaluations in those areas.

140.     This reasoning is a clear departure from ACGME guidelines, which clearly state that it is not appropriate to include "Not Yet Assessable" as part of a graduating resident's final evaluation of eligibility to graduate.

141.     ACGME also mandates that in-training examination scores are not to be used to determine successful mastery of disease sites outside of a clinical rotation.

142.     However, the Letter stated, "the results of her in-service examination are not yet available and may affect the judgement of the clinical competency

committee on her successful mastery of other disease sites that she had weaker performance on during clinical rotations."

143.     On May 12, 2019, Plaintiff provided the Graduate Appeals Committee (the "Appeals Committee") with a written response to the Program Director's false and misleading Letter

144.     On May 14, 2019, the Appeals Committee held a grievance hearing (the "Hearing") to determine whether to uphold, modify, or overturn the Program Director's determination that should be removed from the Program for Plaintiff failure to successfully remediate.

145.     During the Hearing, the Program Director continued to make false and misleading statements about Plaintiff's performance.

146.     For example, the Program Director falsely stated numerous times that Plaintiff did not answer pages.

147.     Plaintiff refuted this claim, however, by providing the Appeals Committee with information regarding problems with the paging system and documentation received from the Chairman showing that Plaintiff had not received a page that she was accused of not returning.

148.     The Program Director falsely stated that due to problems with Plaintiff's academic performance in radiation, biology and physics, an "action plan" involving tutoring was "set in place by the program."

149.     Plaintiff and the Former Program Director contradicted this statement during the Hearing.

150.     The Former Program Director (who had not been present during the Program Director's presentation of evidence) stated there was no institutional plan implemented by the Program, and that the tutoring Plaintiff received was a result of her independent decision to increase her knowledge of the subject matter.

151.     The Former Program Director also stated that the events that required Plaintiff's appeal would not have happened if the Dr. Brown was not the Program Director.

17

152.     During Plaintiff's rotations with Former Program Director, he consistently ranked her as "2 out of 3".

153.     Upon information and belief, the resident whose performance was ranked lower than Plaintiff by the Former Program Director was not placed on a remediation plan and was not recommended for dismissal from the Program.

154.     During the Hearing, the Program Director insinuated that Plaintiff was the only resident who had not obtained the radioactive iodine cases necessary for graduation.

155.     In response, Plaintiff provided the Appeals Committee with an email from her Caucasian colleague, Adrianna Henson, stating that she was still working on her cases, although she was one the residents on the verge of graduation.

156.     The Program Director chose not to mention that during Plaintiff's last rotation, Plaintiff earned a passing score in subject matter that the Program Director claimed Plaintiff had never mastered.

157.     The Program Director erroneously stated that an attending physician (Dr. Farris) and other residents had to intervene and assist Plaintiff during her rotation with the Chairman. This claim was untrue.

158.     During the Program Director's summary of Plaintiff's academic performance during her years of residency, the Program Director neglected to reference several positive evaluations Plaintiff received from several attending physicians during her years of residency.

159.     Moreover, the Program Director claimed that Plaintiff failed to satisfactorily progress in the Program— although Wake Forest's Policy mandates that a resident be reassessed annually before being promoted to the next year of residency.

160.     After the Hearing, the Appeals Committee requested additional information from Plaintiff, which she provided.

161.     On May 16, the Appeal Committee declined to uphold the Program Director's determination that Plaintiff should be dismissed from the Program due to failure to successfully remediate.

162.     Although the Appeals Committee acknowledged that the Program had provided Plaintiff with assistance in addressing the concerns regarding her performance, the Appeals Committee "[found] that the period of formal remediation was inadequate for Dr. Sullivan to improve her performance and that outcomes of failure to obtain expected performance were vague."

163.     Therefore, the Appeals Committee suggested that Plaintiff receive a full and fair opportunity to complete remediation, which included sufficient time to address the concerns regarding her performance, and knowledge of the Program's expectations.

164.     After the Hearing, the Program Director and Chairman implemented a new remediation plan which assessed Plaintiff's knowledge in only one out of the three areas that Plaintiff had been deemed deficient.

165.     Upon information and belief, the leaders of the Program would not have changed the areas of Plaintiff's remediation if she was deemed to be truly deficient.

166.     During the period of remediation, Plaintiff continued to experience retaliation from the Chairman.

167.     Although attending physicians have extensive interaction with the residents, Plaintiff's access to the attendings was severely limited.

168.     When Plaintiff attempted to have a discussion with the Former Program Director about her progress, she was told that the Chairman prohibited him from having any communications with her.

169.     In fact, the Chairman required that the attendings refrain from having any communications with Plaintiff unless he was present, thereby limiting Plaintiff's ability to learn and interact with faculty.

170.     Upon information and belief, other residents were not limited in their ability to learn and interact with the faculty.

171.     On September 30, 2010 Plaintiff successfully completed her remediation period and graduated from residency.

172.     During Plaintiff's residency, she had secured a position as a Radiation Oncologist at a hospital. The hospital rescinded its offer of employment. This decision was due to Plaintiff's inability to begin working at the agreed-upon date.

173.     After Plaintiff finished residency, Dr. Winkfield informed another resident that she intended to leave the Institution because she believed the Program Director and Dr. Greven were racist.

174.     Dr. Winkfield also informed a former attending, Dr. Brian Lally, that she was leaving because of the Chairman's unfair treatment of Plaintiff.

FIRST CLAIM FOR RELIEF

(Race Discrimination in Violation of Title VII)

175.     Plaintiff realleges the foregoing allegations set forth in this Complaint as if fully repeated herein.

176.     Under Title VII of the Civil Rights Act of 1964, an employer is prohibited against discriminating against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." 42 U.S.C. § 2000e-2(a)(1)." *See also Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 821 (4th Cir. 2004).

177.     During Plaintiff's employment with the Program, she was qualified for her position based on the standards provided in the Policy.

178.     Plaintiff is a member of a protected class because she is an African American.

Case 1:20-cv-00281-LCB-JLW     Document 1     Filed 03/30/20     Page 20 of 24

179.     At the time these events occurred, Defendants knew that Plaintiff was a member of this protective class.

180.     Plaintiff experienced adverse employment action because of her race while working at the Program, as alleged herein. The Program Director and Chairman discriminated against Plaintiff on the basis of her race by subjecting her to terms and conditions of employment that were not imposed on Plaintiff's Caucasian co-workers.

181.      As alleged herein, the Program Director required that Plaintiff perform menial tasks not required of her Caucasian peers.

182.     The Program Director also scrutinized Plaintiff's performance more highly than her Caucasian peers and denied her certain procedural protections that Plaintiff was owed under the Policy.

183.     Upon information and belief, other similarly situated residents were not subjected to the same, adverse treatment.

184.     Upon information and belief, Defendants actions were done with malice and reckless indifference to Plaintiff's federally protected rights.

185.     Plaintiff has been harmed by the Defendants' actions

SECOND CLAIM FOR RELIEF

(Race Discrimination in Violation of 42 U.S.C. §1981)

186.     Plaintiff realleges the foregoing allegations set forth in this Complaint as if fully repeated herein.

187.     Under 42 U.S.C. §1981, a private employer cannot discriminate against an employee on the basis of the employee's race.

188.     Defendants' actions, described in Paragraphs 180 to 182 were in violation of Plaintiff's federal, civil rights under 42 U.S.C. §1981.

21

189. Upon information and belief, Defendants actions were done with malice and reckless indifference to Plaintiff's federally protected rights.

190. Plaintiff has been harmed by the Defendants' actions.

THIRD CLAIM FOR RELIEF

(Retaliation in Violation of Title VII)

191. Plaintiff realleges the foregoing allegations set forth in this Complaint as if fully repeated herein.

192. Plaintiff engaged in protected activity when she opposed race and sex discrimination at Wake Forest by reporting the discriminatory treatment Human Resources, the Assistant Dean and the Chairman.

193. Plaintiff's opposition to the perceived discrimination was expressed in a reasonable manner, and based on a reasonable, good faith belief.

194. Defendants took materially adverse action against Plaintiff because of her opposition to their unlawful actions, as alleged herein.

195. The Chairman took materially adverse action against Plaintiff by informing the head of the Oregon Program that Plaintiff was "difficult" because she complained to Human Resources.

196. Upon information and belief, Defendants took materially adverse action against Plaintiff by imposing a pretextual remediation plan on Plaintiff.

197. Upon information and belief, Defendants took materially adverse action against Plaintiff by attempting to remove her from the Program halfway through the remediation period, although the remediation Plan lacked clear objectives and required outcomes.

198. The Chairman took materially adverse action against Plaintiff by restricting her ability to interact with faculty during the remediation period.

22

199.    A causal connection exists between the protected activity and the
        adverse action.

FOURTH CLAIM FOR RELIEF

(Retaliation in Violation of 42 U.S.C. §1981)

200.    Plaintiff realleges the foregoing allegations set forth in this Complaint,
        as if fully repeated herein.

201.    Defendants' actions, as alleged in Paragraphs 194 -198 were in
        violation of Plaintiff's rights under 42 U.S.C. § 1981.

FIFTH CLAIM FOR RELIEF

(Sex Discrimination)

202.    Plaintiff realleges the foregoing allegations set forth in this Complaint
        as if fully repeated herein.

203.    Plaintiff is a member of a protected class because she is a woman.

204.    At the time these events occurred, Defendants were aware of
        Plaintiff's protected status.

205.    Under Title VII of the Civil Rights Act of 1964, an employer is
        prohibited against discriminating against an employee "with respect to his
        compensation, terms, conditions, or privileges of employment, because of
        such individual's race, color, religion, sex, or national origin. . . ." 42
        U.S.C. § 2000e-2(a)(1)." *See also Dixon v. Coburg Dairy, Inc.*, 369 F.3d
        811, 821 (4th Cir. 2004).

206.    Under 42 U.S.C. §1981, a private employer cannot discriminate
        against an employee on the basis of the employee's race.

207.    Plaintiff suffered adverse employment actions by defendants on the
        basis of her sex, as alleged herein. For example, the Program Director

discriminated against Plaintiff on the basis of her sex by implementing adverse employment action against Plaintiff because she needed to breastfeed during the workday.

208.    Plaintiff has suffered mental anguish and emotional distress as the direct and proximate result of Defendant's violation of her civil rights, as alleged herein.

209.    Plaintiff is entitled to the rights and remedies at law provided by Title VII and 42 U.S.C. §1981a.

WHEREFORE, Plaintiff respectfully requests that this Court:

210.    Assume jurisdiction over this action;

211.    Award Plaintiff compensatory damages in amounts to be determined;

212.    Award Plaintiff punitive damages;

213.    Award Plaintiff the costs of bringing this action, including reasonable attorney's fees, expenses and interest in accordance with the law; and

214.    Award such other and further relief as the Court deems just and proper.


This, the 30 day of March, 2020.


/s/ Isabel Alele
Isabel Alele, State Bar No. 53370
Beechler Tomberlin, PLLC
380 Knollwood Street, Ste. 305
Winston-Salem, NC 27103
Telephone: (336) 723-1110

24