IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

NATALIE ALPHONSE SULLIVAN, )
)
      Plaintiff, )
)
   v. ) 1:20CV281
)
WAKE FOREST BAPTIST )
MEDICAL CENTER, and )
WAKE FOREST UNIVERSITY )
HEALTH SCIENCES, )
)
      Defendants. )

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

Before the Court is Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 23.) For the reasons stated below, Defendants' Motion to Dismiss will be granted in part and denied in part.

**I.    BACKGROUND**

Plaintiff, an African American woman, was hired as a medical resident by Defendant Wake Forest Baptist Medical Center ("WFBMC") in its Radiation Oncology Program (the "Program") on July 1, 2015. (ECF No. 22 ¶¶ 10, 26). Almost from the beginning, Plaintiff alleges that the Program Director singled her out for scrutiny and discipline. (*Id.* ¶ 35–37.) The Program Director allegedly scrutinized Plaintiff's performance more closely than she did the performance of Plaintiff's white peers and offered them one-on-one support that was

withheld from Plaintiff. (*Id.*) Faculty members and other WFBMC leadership expressed a fear of what they considered "unfair" treatment and "targeting" by the Program Director. (*Id.* ¶¶ 38–40.) Plaintiff reported this unfair and differential treatment to the Associate Dean for Graduate Medical Education on May 16, 2016 but did not "overtly attribute the discriminatory treatment to race or gender" at that time. (*Id.* ¶¶ 41–42.) Nevertheless, Plaintiff alleges that she "met all the Program's requirements" during her first year, received positive evaluations, and was reappointed for a second year after a full evaluation of her work on July 1, 2016. (*Id.* ¶¶ 27–33.)

Plaintiff's relationship with the Program Director continued to deteriorate during her second year, and on March 17, 2017, Plaintiff reported to Defendants' Chief Diversity Officer that the Program Director was discriminating against her on the basis of her race. (*Id.* ¶ 58.) During a May 8, 2017, meeting to discuss Plaintiff's academic performance, the Program Director "singled [her] out" and disciplined her "for engaging in certain behaviors that were common among the residents," such as using pocket summary guides rather than textbooks to supplement her knowledge while working in medical clinics. (*Id.* ¶¶ 62–66.) Also beginning on May 8, 2017, Plaintiff was given regular mock oral examinations to assess her performance—a practice not immediately extended to Plaintiff's white colleagues and discontinued after her graduation. (*Id.* ¶¶ 67–70.) Plaintiff was also disciplined during her second year for tardiness and "occasional use of her computer and phone for academic purposes" while her white peers were not disciplined for the same behavior. (*Id.* ¶¶ 72–75.) After all residents performed poorly on a physics test, the Program Director "singled out and distorted" Plaintiff's grade "as exceptionally low, although Plaintiff performed within the same

range" as her white peers. (*Id.* ¶ 76.) Plaintiff again complained of racial discrimination on May 16, 2017, this time to the Chairman. (*Id.* ¶ 77.)

Otherwise, Plaintiff alleges a successful second year and was reappointed for a third year on July 1, 2017, based on a full evaluation of her work. (*Id.* ¶ 50.) Her second-year evaluations were mixed and included documentation of some unsatisfactory and some satisfactory performance. (*Id.* ¶¶ 47, 61.) The Program's Chairman "noted Plaintiff's struggles" but ultimately found that she was "performing as expected for a [second-year] resident." (*Id.* ¶ 51.)

Plaintiff gave birth to her second child and took maternity leave from June 5 to July 17, 2017. (*Id.* ¶ 79.) Thereafter, Plaintiff notified the Program Director that she would need to take breaks during the day to pump breastmilk. (*Id.* ¶ 80.) The Program Director routinely criticized Plaintiff for these absences and complained that Plaintiff was "unprofessional" and "difficult to find." (*Id.* ¶¶ 81, 96.) Another resident, who is white, was also breastfeeding during this time and was not criticized for taking breaks to pump breastmilk. (*Id.* ¶¶ 82, 97.)

Plaintiff alleges the Program Director continued to overly scrutinize her work, treat her in an "openly disrespectful manner," and exclude her from educational activities during her third and fourth years. (*Id.* ¶¶ 85–94.) On January 22, 2018, the Program Director invited two white residents to participate in a learning experience but excluded Plaintiff. (*Id.* ¶ 98.) She accused Plaintiff of deficient performance and failure to perform clinical duties. (*Id.* ¶¶ 99, 109.) On January 25, 2018, she threatened to recommend Plaintiff's dismissal from the Program if Plaintiff did not pass her board examination, despite the fact that prior residents were not recommended for dismissal after failing board examinations. (*Id.* ¶ 101–02.) Plaintiff

3

again reported discriminatory behavior to the Associate Dean on January 30, 2018 and met with the Chairman and another professor on February 7, 2018, to discuss her performance. (*Id.* ¶¶ 103–04.) The Chairman and professor assured Plaintiff that she would not be dismissed from the Program and questioned the Program Director's behavior. (*Id.* ¶¶ 105–08.)

Plaintiff's husband complained about the treatment of his wife to Defendants' Chief Diversity and Inclusion Officer ("Diversity Officer") on September 14, 2018. (*Id.* ¶ 111.) The Diversity Officer encouraged Plaintiff to report the discrimination to Human Resources. (*Id.* ¶¶ 114.) Though initially reluctant, Plaintiff eventually agreed and met with Human Resources on October 26, 2018. (*Id.* ¶ 115, 122.) Human Resources ultimately "confirmed Plaintiff's claim that she had been treated differently than other residents" but "did not acknowledge that Plaintiff's unequal treatment was due to her race." (*Id.* ¶ 123.)

On November 26, 2018, the Program Director and Associate Dean placed Plaintiff on a Remediation Plan. (*Id.* ¶ 124.) The Remediation Plan was formalized on December 5, 2018, by the Chairman after he met with Human Resources to discuss Plaintiff's allegations of discrimination. (*Id.* ¶ 131.) Plaintiff's Remediation Plan differed significantly from traditional plans in that it gave Plaintiff only three weeks to remediate while "residents are generally given six months or more." (*Id.* ¶ 134.) It further stated that Plaintiff was deficient in three areas of competency and repeated allegations that Plaintiff had problems with tardiness and attendance due to pumping breastmilk. (*Id.* ¶¶ 138, 140, 142.) On January 10, 2019, she learned that she had been excluded by the Program Director from another educational program available to other white residents. (*Id.* ¶ 143.) On March 5, 2019, despite being "consistently told that she was making satisfactory progress and meeting expectations," Plaintiff received a Notice of

4

Deficiency from the Program Director and Associate Dean stating she was ineligible to complete the Program. (*Id.* ¶¶ 149–50.) She timely appealed the decision to the Graduate Appeals Committee. (*Id.* ¶ 157.)

Plaintiff sought employment elsewhere during this time. (*See id* ¶ 162.) In April 2019, she was extended an oral invitation to join the Radiation Oncology Program at Oregon Health and Science University ("Oregon Program"), which Plaintiff accepted. (*Id.* ¶ 162–63.) When the Chairman learned of the offer, he contacted the Oregon Program and told its chair "that Plaintiff was 'difficult' because she complained to Human Resources." (*Id.* ¶ 164–65.) The Oregon Program's chair shared this conversation with Defendants' Vice Chairman, who shared it with Plaintiff. (*Id.* ¶ 166.) The Oregon Program then rescinded its offer. (*Id.* ¶ 165.) Afterward, the Chairman told Plaintiff "'none of this would have happened' if she had not expressed her concerns to Human Resources." (*Id.* ¶ 167.)

On April 24, 2019, the Program Director issued a Summative Evaluation Letter criticizing Plaintiff's performance as a resident and recommending she be dismissed from the Program. (*Id.* ¶ 168–83.) The Graduate Appeals Committee held a hearing on May 14, 2019 and reversed the Program Director's determination on May 16, 2019. (*Id.* ¶ 185–202.) The Committee found "that the period of formal remediation was inadequate for [Plaintiff] to improve her performance and that outcomes of failure to obtain expected performance were vague" and suggested Plaintiff receive a new remediation plan. (*Id.* ¶ 204–05.) The Program Director and Chairman then implemented a Second Remediation Plan which only required Plaintiff to remediate one subject area, not three. (*Id.* ¶ 206.) Plaintiff successfully completed the remediation and graduated from her residency on September 30, 2019. (*Id.* ¶ 213.)

5

Plaintiff filed this suit on March 30, 2020, and filed a First Amended Complaint on June 5, 2020. (ECF Nos. 1; 11.) Plaintiff filed a Motion to Amend Plaintiff's Amended Complaint on August 10, 2020. (ECF No. 16.) Plaintiff's Proposed Second Amended Complaint ("Proposed SAC") alleged Retaliation (Count I) and Disparate Treatment Discrimination (Count II) in violation of Title VII and § 1981, as well as a violation of Title VI (Count III). (ECF No. 16-1 ¶¶ 218–50.) Defendants opposed the motion arguing in part that the Proposed Second Amended Complaint was futile because Plaintiff "fails to allege an adverse employment action" and "failed to sufficiently allege a comparator that was similarly situated to her" as required for her claim of racial discrimination. (ECF No. 19 at 15–16.) The Court concluded that the allegations in Plaintiff's Proposed SAC were not "insufficient or frivolous on their face" and granted Plaintiff's motion. (ECF No. 21 at 6–7.) Plaintiff then filed her Second Amended Complaint ("SAC") on March 3, 2021. (ECF No. 22.)

## II. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) "challenges the legal sufficiency of a complaint," including whether it meets the pleading standard of Rule 8(a)(2). *See Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). Rule 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), thereby "giv[ing] the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550

U.S. at 570). In assessing a claim's plausibility, a court must draw all reasonable inferences in the plaintiff's favor. *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 539 (4th Cir. 2013). A claim is plausible when the complaint alleges facts that allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. However, "mere conclusory and speculative allegations" are insufficient, *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013), and a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments," *Vitol*, 708 F.3d at 548 (quoting *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006)).

## III.   DISCUSSION

Defendants argue they are entitled to dismissal of Plaintiff's SAC in all or in part because: (1) it does not match the Proposed SAC considered by the Court on Plaintiff's motion to amend; (2) it exceeds the scope of her EEOC charge and is time barred; (3) Plaintiff failed to state a claim for Retaliation; (4) Plaintiff failed to state a claim for Race Discrimination and Discriminatory Discipline; and (5) Defendant Wake Forest University Health Sciences was not Plaintiff's employer.[1]  (ECF No. 24 at 11–24.)

### A.   The Court declines to strike portions of Plaintiff's SAC which violate Fed. R. Civ. P. 15(a)(2)

Defendants first "ask this Court not to consider the amendments ¶¶ 239–40 and the additional claim for Retaliation under Title VI on page 25, as they were not included in

---

[1] Defendants also argue that, "to the extent Plaintiff is pursuing a claim for discrimination on the basis of sex, . . . the claim must be dismissed because Plaintiff failed to exhaust her administrative remedies and the claim exceeds the scope of the EEOC Charge." (ECF Nos. 23 at 1; 24 at 9–10.)  It appears that Plaintiff did allege sex discrimination in an earlier complaint but is no longer pursuing a claim of sex discrimination.  (*Compare* ECF No. 1 ¶¶ 202–209, *with* ECF No. 22.)  The Court will therefore deny as moot this portion of Defendants' motion.

7

[Plaintiff's Proposed SAC] and run afoul of L.R. 15.1." (ECF No. 24 at 13–14.) The Court construes this portion of Defendants' motion as a motion to strike. "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" on its own or upon a proper motion. Fed. R. Civ. P. 12(f). "[T]he function of a [Rule] 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Buser v. S. Food Serv., Inc.*, 73 F. Supp. 2d 556, 559 (M.D.N.C. 1999) (quoting *Sidney–Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983)). "[T]he decision of whether to strike all or part of a pleading rests within the sound discretion of the [c]ourt." *J&J Sports Prods., Inc. v. Lawson*, No. 3:17-CV-02939-JMC, 2019 WL 1754744, at *2 (D.S.C. Apr. 19, 2019) (quoting Barnes v. District of Columbia, 289 F.R.D. 1, 6 (D.D.C. 2012)). Motions to strike "are generally viewed with disfavor because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001).

A party may amend its pleading "once as a matter of course" and, "[i]n all other cases, . . . only with the opposing party's written consent or the court's leave." Fed. R. Civ. P 15(a)(1)–(2). Local Rule 15.1 provides that "[i]f a party is required by the Rules to file a motion in order to seek leave to amend a pleading, the moving party shall attach the proposed amended pleading to the motion."

Here, Defendant is correct that ¶¶ 239–40 of the SAC and Plaintiff's new claim of Retaliation under Title VI were not included in her Proposed SAC. Pursuant to Fed. R. Civ. P. 15(a)(2), Plaintiff was required to obtain either Defendants' consent or the court's leave

8

before making those amendments. Since those amendments were not included in Plaintiff's Proposed SAC as required by Local Rule 15.1, Plaintiff has not obtained the Court's leave. However, the Court in its discretion declines to strike these portions of Plaintiff's SAC in the interest of judicial efficiency. The allegations in ¶¶ 239–40 are merely conclusory restatements of the elements of a discrimination claim.[2] And the standard for adjudicating a Retaliation claim under Title VI is identical to that under Title VII and § 1981, which Plaintiff did include in her Proposed SAC. *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003). Thus, the Court does not find that Defendants will be meaningfully prejudiced by allowing these amendments to stand notwithstanding Plaintiff's violation. Moreover, were the Court to strike these portions and require Plaintiff to properly move to include them under Rule 15(a)(2), the Court would likely grant the motion as these amendments are not prejudicial, futile, or made in bad faith. *See Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986). Such an exercise would be a waste of time and resources for the Court and the parties.

Accordingly, the Court declines to strike these portions of Plaintiff's SAC.

**B.     Plaintiff's Title VII claims are not time barred**

Defendant first argues that "the majority of plaintiff's allegations exceed the scope of her EEOC charge and are time barred." (ECF No. 24 at 11–13.) Before a plaintiff can file suit under Title VII, she must exhaust her administrative remedies by filing a charge with the EEOC. *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). Charges must be filed

---

[2] (*See* ECF No. 22 ¶¶ 239 ("But for Plaintiff's race, she would not have been disciplined differently than her Caucasian peers and denied the procedural protections provided to other residents, as described in ¶¶ 229–238 of the [SAC]."), 240 ("Plaintiff's employer, the Chairman, and/or the Program Director intentionally discriminated against Plaintiff because of her race.").

9

within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). Here, Defendants argue that any claims arising from actions that occurred prior to November 7, 2018—180 days prior to Plaintiff's EEOC filing on May 6, 2019—are time barred. (ECF No. 24 at 11–13.) However, Plaintiff has not alleged any adverse employment actions that occurred prior to November 7, 2018. The only alleged adverse action purportedly giving rise to a claim that occurred prior to that date was the Program Director's exclusion of Plaintiff from participation in gynecologic brachytherapy procedures on January 22, 2018. (ECF Nos. 22 ¶ 98; *see* ECF No. 30 at 24 (listing alleged adverse employment actions).) This allegation relates to Plaintiff's Title VI claim for exclusion from an educational opportunity on the basis of race, however, and does not give rise to a claim for employment discrimination under Title VII. Thus, Defendants have failed to show that any of Plaintiff's claims arising under Title VII are time barred.

### C. Plaintiff has sufficiently stated a claim for Retaliation (Count I)

Title VI, Title VII, and § 1981 each prohibit retaliation against a plaintiff for complaining about prior discrimination. 42 U.S.C. § 2000e-3(a); *Peters*, 327 F.3d at 318 ("[T]he general prohibitions on intentional discrimination embodied in [§ 1981] extend to provide a cause of action to those who can demonstrate that they have been purposefully injured due to their opposition to intentional racial discrimination."); *id.* at 319 (holding that Title VI's implicit prohibition on retaliation is "enforceable via an implied private right of action"). Retaliation claims, whether brought pursuant to Title VI, Title VII, or § 1981, may be established "either through direct and indirect evidence of retaliatory animus, or through the burden-shifting framework of *McDonnell Douglas*." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243,

249 (4th Cir. 2015) (citing *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (analyzing Title VII retaliation and § 1981 retaliation under the same framework); *Peters*, 327 F.3d at 320 (holding that a Title VI retaliation claim is analyzed under the Title VII framework). A prima facie claim of retaliation includes allegations from which it can be reasonably inferred that (1) plaintiff engaged in a protected activity, (2) she suffered an adverse action, and (3) there was a causal connection between the activity and the adverse action. *Boyer-Liberto*, 786 F.3d at 281. "[T]he antiretaliation provision[s] [do] not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). In the retaliation context, actions are "adverse" if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.*

Here, Plaintiff specifically alleges that the Chairman reached out to Plaintiff's prospective employer and dissuaded it from hiring her "because she complained to Human Resources" about ongoing racial discrimination, causing it to rescind its offer of admission. (ECF No. 22 ¶ 165.) Plaintiff alleges that her prospective employer relayed this conversation to the Program's Vice Chairman, who then notified Plaintiff. (*Id.* ¶ 166.) The Chairman then allegedly told Plaintiff that "'none of this would have happened' if she had not expressed her concerns to Human Resources." (*Id.* ¶ 167.) Thus, Plaintiff has alleged sufficient facts to raise the reasonable inference of retaliatory animus. Further, the Court finds that the Chairman's alleged attempt to sabotage Plaintiff's potential employment was sufficiently harmful to

11

dissuade a reasonable worker from making or supporting a charge of discrimination. Therefore, Plaintiff has stated a claim of Retaliation under Title VI, Title VII, and § 1981.

### D. Plaintiff has not stated a claim for Racial Discrimination or Discriminatory Discipline (Count II)

It is a violation of Title VII for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). To state a claim under either law, a plaintiff must allege that she suffered an adverse employment action because of her race.[3] *Comcast Corp. v. Nat'l Assoc. of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) ("[A § 1981 plaintiff] must initially plead . . . that, but for race, [she] would not have suffered the loss of a legally protected right."); *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015) (stating that a Title VII plaintiff must "allege facts to satisfy the elements of a cause of action created by that statute—i.e., [that defendant] failed or refused to hire her *because of* her race" (internal quotations omitted)). This is true both of claims for Race Discrimination and

---

[3] Defendants argue that the Court should analyze Plaintiff's § 1981 claim under a different standard than her Title VII claim. (ECF No. 24 at 13–15.) Prior to the Supreme Court's ruling in *Comcast*, "Courts long relied on the *McDonnell Douglas* burden-shifting framework to evaluate claims of race discrimination in employment under § 1981." *McKenzie-El v. Am. Sugar Ref., Inc.*, No. 21-1089, 2021 WL 5412341, at *2 (4th Cir. Nov. 19, 2021). Now, it is unclear what role *McDonnell Douglas* plays in establishing causation in § 1981 cases. *Compare id. with Gary v. Facebook, Inc.*, 822 F. App'x 175, 180 (4th Cir. 2020) *and BNT Ad Agency, LLC v. City of Greensboro*, 837 F. App'x 962, 970 (4th Cir. 2020). Regardless, this Court finds in this case that Plaintiff has failed to allege racial discrimination under § 1981 or Title VII whether assessed under *McDonnell Douglas* or traditional principles of but-for causation.

Discriminatory Discipline. *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985) ("The employment discrimination laws require as an absolute precondition to suit that some adverse employment actions have occurred.").

"An adverse action is one that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Courts generally have found that a disciplinary warning, without more, is not an adverse employment action. *See, e.g., McDougal-Wilson v. Goodyear Tire & Rubber Co.*, 427 F. Supp. 2d 595, 609–10 (E.D.N.C. 2006) (finding that verbal and written warnings for tardiness and poor performance "did not adversely affect the 'terms, conditions, or benefits' of [plaintiff's] employment"); *Newman v. Giant Food, Inc.*, 187 F. Supp. 2d 524, 528–29 (D. Md. 2002) ("Such discipline, without evidence that the warning could lead to further disciplinary action, such as termination, does not constitute an adverse employment action."), *aff'd sub nom. Skipper v. Giant Food Inc.*, 68 F. App'x 393 (4th Cir. 2003); *Keene v. Thompson*, 232 F. Supp. 2d 574, 580 n.6 (M.D.N.C. 2002) (finding no adverse employment action where a notice of suspension was never served and was ultimately removed from Plaintiff's discipline file).

Here, Plaintiff argues that she has alleged five adverse employment actions: (1) imposition of the remediation plan; (2) the initial determination that Plaintiff failed to remediate; (3) advice that Plaintiff could not appeal the Notice of Deficiency; (4) the Chairman's interference with Plaintiff's transfer opportunity; and (5) the restrictions on Plaintiff's ability to learn from and engage with faculty. (ECF No. 30 at 24.) With regard to

13

the first three actions, Plaintiff has failed to allege facts from which the Court can infer that the remediation plan significantly altered her employment. The Complaint does not describe what the plan entailed or if it required "significantly different responsibilities." *See Hoyle*, 650 F.3d at 337. Although the Program Director threatened to recommend Plaintiff's dismissal from the Program, (ECF No. 22 ¶ 101), that threat never manifested, and Plaintiff was allowed to continue and graduate. Moreover, the plan was ultimately replaced by the Graduate Appeals Committee. Since Plaintiff makes no allegation of racial discrimination against the committee, this Court cannot infer that, but for Plaintiff's race, she would not have been placed on a remediation plan. To the extent that Plaintiff argues that the initial remediation plan was more intensive than the plan imposed by the committee—more intensive due to the Program Director's racial discrimination—the Complaint alleges no facts from which the Court can assess whether the differences between the two plans are so significant as to constitute an adverse employment action.

Regarding the Chairman's interference with Plaintiff's transfer opportunity, Plaintiff has alleged no facts to support an inference that the Chairman discriminated against Plaintiff based on her race. As discussed in Section III.C, *supra*, Plaintiff instead alleges that the Chairman discouraged Plaintiff's prospective employer from hiring Plaintiff "because she complained to Human Resources." (*Id.* ¶ 165.) And with regard to the restrictions on Plaintiff's ability to learn from and engage with faculty, this may constitute an adverse educational action under Title VI, but Plaintiff has not alleged sufficient facts for the Court to infer that a restriction on Plaintiff's ability to learn constituted a significant change in Plaintiff's employment.

14

Because Plaintiff has not alleged that she suffered an adverse employment action because of her race, her claims of race discrimination in employment claims pursuant to Title VII and § 1981 will be dismissed.

### E.  WFUHS

Finally, Defendants move to dismiss Defendant WFUHS from this action because "WFUHS does not meet the statutory definition of an employer." (ECF No. 24 at 24.)

Under Title VII, an individual may have more than one employer. *Murry v. Jacobs Tech., Inc.*, No. 1:10-CV-771, 2012 WL 1145938, at *6 (M.D.N.C. Apr. 5, 2012), *aff'd*, 568 F. App'x 265 (4th Cir. 2014). In *Butler v. Drive Automotive Industries of America, Inc.*, 793 F.3d 404 (4th Cir. 2015), the Fourth Circuit adopted a nine-factor test to determine whether a Title VII plaintiff "is jointly employed by two or more entities." *Id.* at 414. These factors are:

> (1) authority to hire and fire the individual; (2) day-to-day supervision of the individual, including employee discipline; (3) whether the putative employer furnishes the equipment used and the place of work; (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes; (5) the length of time during which the individual has worked for the putative employer; (6) whether the putative employer provides the individual with formal or informal training; (7) whether the individual's duties are akin to a regular employee's duties; (8) whether the individual is assigned solely to the putative employer; and (9) whether the individual and putative employer intended to enter into an employment relationship.

*Id.* The court also clarified that, generally, the first three of these factors will be "most important;" that "courts can modify the factors to the specific industry context;" and that the ninth factor will generally be "of minimal consequence." *Id.* at 414–15, 414 n.12.

Here, the Court finds that, even when viewing the facts in the light most favorable to Plaintiff, she has failed to allege facts supporting that WFUHS was among her employers. The

15

only allegation that Plaintiff makes in her SAC regarding her alleged employment with WFUHS is that she "was in a contractual, employment relationship with WF[U]HS and/or WFBMC." (ECF No. 22 ¶ 219.) However, Plaintiff's employment contract was only with WFBMC. (*See* ECF No. 23-1.)[4] Under the employment contract, WFUBMC had the authority to set salary and hire, reappoint, promote, and terminate Plaintiff. (*Id.* ¶¶ 4, 16; *see id.* at 9–11.) WFBMC controlled the day-to-day supervision of Plaintiff including her work schedule. (*Id.* ¶¶ 5, 8.) WFBMC also supplied Plaintiff with her white coat for her uniform, her place of work, food services, and laundry services. (*Id.* ¶ 12.) WFBMC was also responsible for Plaintiff's payroll and insurance. (*Id.* ¶¶ 4, 9.)

Notably absent from the employment contract are any indications that WFUHS was responsible for any aspects of Plaintiff's employment. Nor does Plaintiff allege any facts regarding WFUHS to support any of the *Butler* factors. Further, she fails to address Defendants' argument that WFUHS is not her employer in her response. Thus, Plaintiff has failed to allege any facts to support a finding that WFUHS was her employer, and therefore, Plaintiff's Title VII and § 1981 claims against WFUHS will be dismissed.

For the reasons stated herein, the Court enters the following:

---

[4] Generally, on a Rule 12(b)(6) motion to dismiss, a court cannot consider documents beyond the complaint without converting the motion into a motion for summary judgment. *See Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013). The court can, however, properly consider "documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citation omitted).

# ORDER

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss, (ECF No. 23), is **GRANTED** in part and **DENIED** in part. The motion is **GRANTED** as to Plaintiff's claims of Race Discrimination and Discriminatory Discipline (Count II) as to all Defendants, and Plaintiff's claims arising under Title VII and § 1981 (Counts I & II) against Defendant WFUPH. The motion is **DENIED** as to Plaintiff's remaining claims.

This the 11th day of April 2022.

/s/ Loretta C. Biggs  
United States District Judge