# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| NATALIE ALPHONSE SULLIVAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:20CV281 |
| | ) | |
| WAKE FOREST UNIVERSITY | ) | |
| HEALTH SCIENCES and WAKE | ) | |
| FOREST UNIVERSITY BAPTIST | ) | |
| MEDICAL CENTER, | ) | |
| | ) | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Plaintiff Natalie Alphonse Sullivan brings this action against Defendants Wake Forest University Health Sciences ("WFUHS") and Wake Forest University Baptist Medical Center ("WFBMC"), alleging retaliation in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and 42 U.S.C. § 1981, and discrimination in violation of Title VI. (ECF No. 22 ¶ 1, at 28–29.) Before the Court is Defendants' Motion for Summary Judgment. (ECF No. 63.) For the reasons stated herein, Defendants' motion will be granted.

## I. BACKGROUND

Plaintiff is an African American woman who worked for WFBMC as a medical resident in its Radiation Oncology Residency Program (the "Residency Program"). (ECF No. 22 ¶¶ 10, 23–26.) The Residency Program is a four-year program that is accredited by the

Accreditation Council for Graduate Medical Education ("ACGME"). (ECF Nos. 65 ¶ 5; 66 ¶¶ 9, 15.)

Originally, after having completed medical school, Plaintiff was unsuccessful for two consecutive years in gaining admittance into any residency program for which she applied. (ECF No. 77-1 at 27:22–28:17, 31:17-19, 32:12–33:13.) However, after her second failed attempt at securing admittance to a residency program, Dr. William Blackstock, then-chair of the Radiation Oncology Department (the "Department"), (ECF No. 66 ¶ 7), invited Plaintiff to do a one-year research fellowship and to informally participate in aspects of the Department's Residency Program, (ECF Nos. 77-1 at 33:11–35:22; 66 ¶ 32).

Following the completion of her fellowship, Dr. Blackstock and Dr. Michael Chan, then-Department Residency Program Director, (ECF No. 66 ¶ 5), streamlined consideration of Plaintiff's application to the Residency Program, and Plaintiff was admitted into the Residency Program, (*id.* ¶ 33). Some faculty members of the Department expressed unease regarding whether Plaintiff had shown that she could successfully complete the Residency Program, since Plaintiff's credentials, including her grades during medical school, standardized test scores, clinical experience, and her prior inability to match into another residency program, were far from consistent with the attributes of a typical resident. (*Id.* ¶ 34.) Despite such reservations, it was generally agreed that, with adequate support from the Department, Plaintiff could successfully complete the Residency Program and pass her Board exams. (*Id.* ¶ 36.) In 2017, Dr. Chan became Vice Chair of the Department, and the Residency Program Director role was transitioned to Dr. Doris Brown. (ECF Nos. 66 ¶ 6; 65 ¶ 4.)

The Residency Program follows national standards set forth by ACGME, (ECF Nos. 66 ¶ 9; 77-2 at 81:8–82:20), and integrates into its curriculum several competencies, pursuant

2

to ACGME requirements, (*see* ECF No. 65-1 at 15–18). During Plaintiff's residency, those competencies included Patient Care and Procedural Skills, Medical Knowledge, Practice-Based Learning and Improvement, Interpersonal and Communication Skills, Professionalism, and System-Based Practice. (*Id.*) Further, in line with ACGME guidance, the Residency Program has a Clinical Competency Committee (the "CCC") that serves to evaluate each resident's development of these competencies by noting their progress over time on bi-annual Milestone Evaluations, and to make recommendations on any remedial measures that should be taken for an underperforming resident. (ECF Nos. 65-1 at 13; 66 ¶ 11, 14.)

In the Milestones Evaluations, each resident is scored between Levels 1–5 on each of the ACGME competencies. (ECF No. 66 ¶ 12.) Levels 1–4 are viewed to track parallel to a resident's year in the Residency Program,[1] and Level 5 is an aspirational score reserved for excelling residents that the CCC views as surpassing the expectations of a graduating resident. (*Id.* ¶ 13.) In her first year, Plaintiff scored Level 1 on all areas, consistent with her year. (ECF No. 65-2 at 4–6.) However, for her second, third, and fourth years of residency, each year, Plaintiff scored below the Level that corresponded to her year in at least two competency areas. (*Id.* at 10–13, 14–19, 20–22.)

After Plaintiff's second year of residency, the Department faculty convened to determine whether to keep Plaintiff in the Residency Program. (ECF No. 65 ¶¶ 7, 12.) Faculty members decided that they could support Plaintiff through her deficiencies, (ECF No. 66 ¶ 52), through mentorships, (*see* ECF Nos. 65 ¶ 21; 66 ¶¶ 46–47; 75 ¶¶ 5, 9, 10), the collection of resources, tutoring, supplemental courses, (*see* ECF Nos. 65 ¶ 21; 66 ¶¶ 46–47; 67 ¶¶ 12–

---

[1] Therefore, a resident in her first year would be expected to score a Level 1 on any given area and would be expected to score a Level 4 in her fourth and final year. (ECF No. 66 ¶ 13.)

3

13 ; 69 ¶¶ 27–29), additional time off to prepare for exams, (ECF No. 65-5 at 2), and assistance with family responsibilities, (*see* ECF Nos. 77-2 at 9:16–11:1; 75 ¶ 12).

Nonetheless, throughout her years as a resident, Plaintiff also struggled with underperformance on annual standardized assessments residents are required to take, consistently scoring in a low percentile range in national percentile rankings that compared to residents across the nation. (ECF No. 77-1 at 40.) In efforts to help Plaintiff improve her scores on these standardized exams, Dr. Brown implemented two action plans, (ECF Nos. 77-2 at 141:12-21; 65-14 at 2); Plaintiff met with Dr. Chan for weekly tutoring sessions, (ECF Nos. 77-2 at 141:12-21; 66 ¶ 46; 70 ¶ 20); faculty members and a chief resident spent extra time with Plaintiff, (ECF Nos. 70 ¶ 22; 77-2 at 243:3-25; 67 ¶¶ 12–13); and Plaintiff repeated courses, (ECF Nos. 65 ¶ 20; 65-14 at 2). Despite these efforts, Plaintiff showed little to no improvement in her scores. (ECF No. 65-11 at 2–3.) Plaintiff demonstrated a similar trend of underperformance in her required clinical rotations, according to multiple faculty members of the Department. (ECF Nos. 75 ¶¶ 18–21; 66 ¶¶ 48, 50; 68 ¶ 11; 69 ¶ 17; 65 ¶¶ 14, 22.)

Amidst these performance struggles, Plaintiff developed concerns regarding discriminatory treatment and retaliation from her Residency Program Director, Dr. Brown. (ECF No. 22 ¶¶ 35, 43.) Plaintiff observed that Dr. Brown scrutinized Plaintiff's performance more frequently than her peers and disciplined Plaintiff more severely than her peers, among other observations. (*Id.* ¶¶ 36, 71.) On May 16, 2017, in an effort to have these concerns addressed, Plaintiff emailed Dr. Blackstock to express her concern "about Dr. Brown's intentions" and "unfairness in dealing" with Plaintiff, writing that she felt "targeted." (ECF No. 77-1 at 38.) On or around the same day, Plaintiff met with Mitch Sokolosky, Associate Dean of Graduate Medical Education ("GME"). (ECF Nos. 74-1 at 2; 65 ¶ 24). Plaintiff

4

complained to Dr. Sokolosky that Dr. Brown was treating her unfairly and differently compared to others but did not explicitly attribute such treatment to race or gender at that time. (ECF No. 74-1 at 2.) Plaintiff "adamantly requested" that Dr. Sokolosky keep her concerns confidential, and Dr. Sokolosky agreed. (*Id.*) However, after Plaintiff returned to Dr. Sokolosky a second time about the same issue, Dr. Sokolosky decided that this time he needed to follow up with Dr. Blackstock about Plaintiff's concerns. (ECF Nos. 74-1 at 2; 77-3 at 110:21–112:9.) Dr. Blackstock expressed that Plaintiff was underperforming, and that Dr. Brown was just providing honest feedback. (ECF No. 74-1 at 2.)

In summer 2018, Dr. Sokolosky announced the formation of the Performance Management Advisory Group ("PMAG"), a committee designed to assist residency programs in managing underperforming residents. (ECF Nos. 77-3 at 106:3-12; 74-1 at 2.) On August 21, 2018, Plaintiff failed her Board exams. (ECF No. 66-2 at 2.) Dr. Sokolosky opined that Plaintiff would be a good case to discuss with the PMAG. (ECF No. 74-2 at 3.)

Dr. Brown met with PMAG on October 18, 2018, to discuss Plaintiff's performance. (ECF No. 65-12 at 2.) During this meeting, it was recognized by PMAG that Plaintiff continued to demonstrate poor performance in competency areas from Milestone Evaluations and on exam scores. (*Id.*) As a result of the meeting, on October 19, 2018, Dr. Sokolosky recommended that a formal remediation plan (the "First Remediation Plan") be drafted. (ECF No. 74-3 at 2.) After Department faculty and staff collaborated on a remediation plan, (*see generally* ECF Nos. 65-6; 65-7; 65-8; 65-9), the First Remediation Plan was finalized and sent to Plaintiff, (*see* ECF No. 65-10). The First Remediation Plan, effective as of December 4, 2018, described Plaintiff's performance issues, Residency Program expectations, required actions, and the potential consequences of Plaintiff's failure to remediate. (*See id.* at 2–3.)

Plaintiff questioned the issuance of the First Remediation Plan and persisted in her claims that she was being targeted by Dr. Brown. (ECF No. 77-3 at 115:5–117:25.) As a result, Dr. Sokolosky convened clinical faculty members to convey directly to Plaintiff their assessment of her performance. (ECF No. 74-1 at 5–6.) Each faculty member told Plaintiff that she was underperforming. (*Id.*) Around the same time this was occurring, Plaintiff's husband, who was also a resident at Wake Forest, complained to David McIntosh, the Director of Diversity and Inclusion, that Dr. Brown was treating Plaintiff unfairly. (ECF Nos. 77-4 at 122:4–123:8; 77-5 at 40:3–43:4.) Eventually, as a result of the complaints of Plaintiff and her husband to others, Human Resources Manager Tonya Robbins was asked to conduct an investigation, which began on October 26, 2018. (ECF Nos. 73 ¶¶ 5, 7; 80-1 at 6–26.) At the end of her investigation in November 2018, Ms. Robbins concluded that, though Plaintiff was treated differently than others and Ms. Robbins wanted to ensure to validate that perceived experience by Plaintiff, she was unable to substantiate any acts of discrimination based on race or gender. (ECF No. 73 ¶¶ 8–11.)

In January 2019, it was reported to Dr. Sokolosky that Plaintiff failed her Head & Neck/GYN rotation, and that Plaintiff could not be signed off as safe for independent practice. (ECF No. 74-5 at 2.) Dr. Sokolosky promptly advised Plaintiff that the Residency Program would not extend her graduation date for her to conduct additional remediation, (ECF No. 77-3 at 129:6–130:11), and the Department issued Plaintiff a Notice of Deficiency on March 5, 2019, which communicated that additional remediation efforts would not be offered to Plaintiff and that Plaintiff would not be able to state that she successfully completed the Residency Program, (ECF No. 77-1 at 41).

After Plaintiff was issued the Notice of Deficiency, faculty from the Department helped Plaintiff consider her options, including locating a potential transfer location. (ECF Nos. 77-1 at 195:6-19; 65 ¶ 26.)  Dr. Blackstock recommended that Plaintiff to reach out to Dr. Charles Thomas, the Chair of the Oregon Health and Sciences University ("OHSU") Radiation Oncology Department. (ECF No. 77-6 at 7.)  Though Dr. Thomas initially invited Plaintiff to participate in a mock exam session and put into motion a potential visiting rotation, (ECF No. 77-6 at 8, 10–11), Dr. Thomas grew disenchanted with Plaintiff's contact strategy and approach, (ECF No. 77-7 at 8, 12).  Nonetheless, Plaintiff participated in OHSU's mock oral exam, (ECF No. 77-1 at 197:13–198:5), and Dr. Thomas remained open to Plaintiff conducting a visiting rotation, (ECF No. 77-6 at 41:17-23).  However, Dr. Sokolosky informed Plaintiff that Wake Forest would not sign off on a visiting rotation, so the visiting rotation never took place. (ECF No. 77-1 at 207:21–208:4.)

In non-traditional fashion, Plaintiff was permitted to appeal the Notice of Deficiency decision she was issued. (ECF No. 77-3 at 148:23–149:13.)  After review of the appeal, an appeal committee composed of Program Directors throughout the hospital found that Plaintiff did not meet the criteria for independent practice, but that the Residency Program should extend Plaintiff's residency beyond the typical four years to permit a second remediation period. (ECF No. 77-1 at 42.)  Though an extended residency remediation period was unprecedented for the Department, another remediation plan (the "Second Remediation Plan") was finalized and delivered to Plaintiff. (ECF No. 65-16 at 2–4.)  After the second remediation period, which lasted approximately three months, (*see id.* at 2), Plaintiff graduated on September 30, 2019, (ECF No. 22 ¶ 213).

Plaintiff initiated this action on March 30, 2020, and filed a First Amended Complaint on June 5, 2020. (ECF Nos. 1; 11.) Plaintiff later filed a Second Amended Complaint on March 3, 2021. (ECF No. 22.) In her Second Amended Complaint, Plaintiff brought three claims for relief against Defendants: (1) retaliation in violation of Title VI, Title VII, and 42 U.S.C. § 1981 (First Claim for Relief); (2) race discrimination and discriminatory discipline in violation of Title VII and 42 U.S.C. § 1981 (Second Claim for Relief); and (3) violation of Title VI (Third Claim for Relief). (*Id.* at 25–29.) Based on these claims, Plaintiff seeks compensatory damages, punitive damages, and attorney's fees. (*Id.* at 29.)

On March 17, 2021, Defendants moved to dismiss all of Plaintiff's claims and to dismiss WFUHS as a named defendant from this case. (ECF No. 23 at 1.) The Court granted Defendants' Motion to Dismiss in part and denied it in part. (ECF No. 34 at 17.) The Court granted the motion "as to Plaintiff's claims of Race Discrimination and Discriminatory Discipline (Count II) as to all Defendants, and Plaintiff's claims arising under Title VII and § 1981 (Counts I & II) against [WFUHS]."[2] (*Id.*) However, the Court denied the motion as to Plaintiff's remaining claims. (*Id.*)

Thus, the Court addresses Plaintiff's remaining claims in this case: retaliation under Title VI as to both Defendants and retaliation under Title VII and § 1981 as to WFMBC (First Claim for Relief), and discrimination in violation of Title VI as to both Defendants (Third Claim for Relief).

---

[2] While the Second Amended Complaint references the First Claim for Relief, the Second Claim for Relief, and the Third Claim for Relief, (*see* ECF No. 22 at 25–29), the Court's Order on Defendants' Motion to Dismiss references "Counts" rather than "Claims for Relief," (*see* ECF No. 34 at 17). However, Counts I and II in that Order correspond with the First Claim for Relief and the Second Claim for Relief in the Second Amended Complaint. In this Order, the Court references "Claims for Relief," as is so in the Second Amended Complaint.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (internal citations and quotations omitted).  "[I]n deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant" and to "draw all reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs*, 780 F.3d at 568).  A court "cannot weigh the evidence or make credibility determinations," *Jacobs*, 780 F.3d at 569 (citations omitted), and thus must "usually" adopt "the [nonmovant's] version of the facts," even if it seems unlikely that the nonmoving party would prevail at trial, *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).  Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record" or "showing that the materials

cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see also*

*Celotex*, 477 U.S. at 324.

## III.    DISCUSSION

Defendants contend that Plaintiff has not presented evidence necessary to meet her burden to establish that Defendants are recipients of federal funding that are statutorily covered by Title VI. (ECF No. 77 at 37.)  Defendants also argue that Plaintiff has not forecast sufficient evidence to establish either her claim for retaliation under Title VI, Title VII, and § 1981, or her claim for Title VI discrimination.  (*Id.* at 31, 37.)  Plaintiff retorts that Defendants are federal funding recipients covered by Title VI, (ECF No. 80 at 27–28), and that Plaintiff can establish that Defendants engaged in retaliation against Plaintiff in violation of Title VI, Title VII, and § 1981 and discrimination in violation of Title VI, (*id.* at 18–19, 32).  Plaintiff also contends that her claims support her entitlement to compensatory, emotional, and punitive damages.  (*Id.* at 32–34.)

### A.    Title VI Federal Funding Requirement

Under Title VI, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  To determine the applicability of Title VI, the Court must first determine whether Defendants are statutorily covered recipients of federal funding.  In order for a Title VI claim to be sustained, a plaintiff must "show . . . evidence that a defendant receives federal funds for employment purposes." *Luallen v. Guilford Health Care Ctr.*, No. 1:02CV00738, 2003 WL 23094916, at *11 (M.D.N.C. Dec. 18, 2003), *aff'd*, 115 F. App'x 167 (4th Cir. 2004) (unpublished); *see also Keeshan v. Eau Claire Coop. Health Ctrs., Inc.*, No. 3:05-3601-MBS, 2007 WL 2903962, at *19–20 (D.S.C. Oct. 2, 2007).

10

In their Answer to Plaintiff's Second Amended Complaint, Defendants admit Plaintiff's allegation that WFBMC "w[as] receiving federal financial assistance . . . for employment costs relating to" the Residency Program but deny the same as to WFUHS. (ECF Nos. 22 ¶ 244; 36 ¶ 244.) Since Defendants concede that WFBMC receives federal funding for employment costs relating to the Residency Program, the Court finds that WFBMC receives such federal funding and is therefore a Title VI employer. However, Plaintiff has failed to adduce any evidence to establish that WFUHS receives federal funding for the primary purpose of employment and, in turn, to demonstrate that Defendant WFUHS is a Title VI employer. Due to Plaintiff's failure to establish this, the Court finds that Defendants are entitled to summary judgment in their favor as to Plaintiff's Title VI claims against WFUHS.

**B.      Retaliation Claim Against WFBMC under Title VI, Title VII, and 42 U.S.C. § 1981**

Retaliation against a plaintiff for complaining about prior discrimination is prohibited under Title VI, Title VII, and § 1981. 42 U.S.C. § 2000e-3(a); *see Peters v. Jenney*, 327 F.3d 307, 318–19 (4th Cir. 2003) (holding that prohibitions on intentional discrimination under § 1981 "extend to provide a cause of action to those who can demonstrate that they have been purposefully injured due to their opposition to intentional racial discrimination" and that Title VI's implicit prohibition on retaliation is "enforceable via an implied private right of action"). Further, retaliation claims, whether brought pursuant to Title VI, Title VII, or § 1981, may be established "either through direct and indirect evidence of retaliatory animus, or through the burden-shifting framework of *McDonnell Douglas*." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (citing *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (analyzing Title VII retaliation and §

1981 retaliation under the same framework); *Peters*, 327 F.3d at 320 (holding that a Title VI retaliation claim is analyzed under the Title VII framework).

The *McDonnell Douglas* framework is a "three-step burden-shifting framework."*Foster*, 787 F.3d at 250. Under *McDonnell Douglas*, a prima facie claim for retaliation is established by showing (1) that the plaintiff engaged in a protected activity, (2) that the plaintiff suffered an adverse action, and (3) that a causal relationship existed between the protected activity and the adverse action. *Id.* Once a prima facie case is established, the burden shifts to the employer to show that adverse action was taken for "a legitimate non-retaliatory reason." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021). Should the employer make this showing, the burden then shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported non-retaliatory reasons were pretext for discrimination. *Id.*

Here, Plaintiff asserts that two acts constitute unlawful retaliation: (1) Dr. Brown's decision to place her on the First Remediation Plan and (2) purported statements made by Dr. Blackstock on a phone call with Dr. Thomas "intending to harm her professional prospects." (ECF No. 80 at 20, 24.)[3] The Court addresses each of these acts that Plaintiff argues to be retaliatory in turn.

---

[3] The Second Amended Complaint alleges two other adverse actions contributing to unlawful retaliation, to include Defendants' alleged attempt to remove Plaintiff from the Residency Program halfway through the period of the First Remediation Plan and Dr. Blackstock's restriction of Plaintiff's interactions with faculty during the effective period of the Second Remediation Plan. (ECF No. 22 ¶¶ 225–26.) For clarity's sake, the Court notes that what Plaintiff alleges to be Defendants' attempt to remove Plaintiff from the Residency Program halfway through the period of the First Remediation Plan is the Notice of Deficiency that was issued on March 5, 2019. (ECF No. 22 ¶¶ 150–52.) Defendants address both alleged adverse actions in their Brief in Support of their Motion for Summary Judgment. (ECF No. 77 at 31, 36–37.) Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment does address the Notice of Deficiency, but solely in the context of arguing that her appeal to the Notice of Deficiency served as a protected activity that motivated a wholly different adverse action. (*See* ECF No. 80 at 24–26 (arguing that Plaintiff's appeal of the Notice of Deficiency was the protected activity that motivated the phone call between Dr. Blackstock and Dr. Thomas in which Dr. Blackstock allegedly made negative statements).) Plaintiff's brief does not include a

12

1. <u>Dr. Brown's Decision to Place Plaintiff on the First Remediation Plan</u>

Defendants do not contest that Plaintiff's complaints to HR regarding Dr. Brown's actions constitutes protected activity. (*See* ECF No. 77 at 31–35); *Volochayev v. Sebelius*, 513 Fed. App'x 348, 354 (4th Cir. 2013) (unpublished) (citing *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981)) ("[I]nformal complaints about discriminatory treatment relating to a protected status constitute protected activity under Title VII"). Nor do they contest that placing Plaintiff on a remediation plan could qualify as an adverse action. (*See* ECF No. 77 at 31–35.) Rather, Defendants contend that Plaintiff's claim of retaliation fails on the third element of a prima facie case—causation. (*Id.* at 34–35.)

"Fourth Circuit precedent addressing the causation prong of a *prima facie* case of retaliation requires that a plaintiff demonstrate that the decisionmaker imposing the adverse action have actual knowledge of the protected activity," at the time the alleged adverse action is taken. *Roberts*, 998 F.3d at 125. Thus, in this case, Plaintiff must demonstrate that Dr. Brown had actual knowledge that Plaintiff complained of race discrimination at the time the decision was made to place her on a Remediation Plan. The Court finds that the evidence in the record does not support such a conclusion.

The drafting of the First Remediation Plan was set in motion by Dr. Sokolosky's recommendation, which occurred days before the HR investigation of Plaintiff's

---

response regarding either of the two alleged instances as adverse actions. (*See generally* ECF No. 80.) As a result of her failure to respond with argument on either of these instances in that context, Plaintiff effectively concedes that neither of these originally-alleged adverse actions constitute unlawful retaliation, and the Court concludes the same. *Brand v. N.C. Dep't Crime Control & Pub. Safety*, 352 F. Supp. 2d 606, 618 (M.D.N.C. 2004) (holding that a plaintiff who did not address, in its response brief, a defendant's motion for summary judgment concerning the plaintiff's hostile work environment claim caused the plaintiff to effectively concede that he did not state a hostile work environment claim).

discriminatory concerns began. (ECF Nos. 74-3 at 2; 73 ¶¶ 5, 7; 80-1 at 6–26.) The record does not include any evidence that Dr. Brown had any knowledge of Plaintiff's concerns about racial discrimination prior to the start of the HR investigation. *See Jefferies v. UNC Reg'l Physicians Pediatrics*, 392 F. Supp. 3d 620, 629 (M.D.N.C. 2019) (finding establishing causal connection requires a plaintiff to show both that the protected activity preceded materially adverse action and that the employer knew of the protected activity). Dr. Brown has testified that, until Plaintiff's deposition in this litigation, she did not know that Plaintiff complained of race discrimination. (ECF No. 81-5 at 43:8–45:19.) According to Dr. Brown's testimony, though she was aware of general complaints made by Plaintiff against her, she had no knowledge that the complaints regarded race discrimination specifically. (*Id.* at 44:23–45:19.) Also, Dr. Sokolosky testified that, until he learned that the HR investigation that took place was based on race concerns, he was not aware of Plaintiff's concerns of race discrimination, also stating that Plaintiff's concerns were never brought forth by Plaintiff as racial concerns until the investigation. (ECF No. 77-3 at 83:6–85:1.) Dr. Winkfield similarly testified that, during her mentorship of Plaintiff, Plaintiff had only ever expressed to her that Dr. Brown "was picking on her by unfairly critiquing her performance" and that Plaintiff "did not describe the behavior as discriminatory based on her race or gender." (ECF No. 75 ¶ 33.)

Admittedly, in a meeting between Ms. Robbins and Plaintiff regarding the findings from her October 26, 2018, HR investigation, Ms. Robbins told Plaintiff that she believed that Dr. Brown was aware of Plaintiff's concerns "from the beginning." (ECF No. 79, Recording 10 at 14:55–15:10.) However, there is no evidence demonstrating precisely what Dr. Brown knew about Plaintiff's concerns, and more specifically, no evidence demonstrating that Dr. Brown knew that Plaintiff's concerns regarded racial discrimination.

Further, even if it could be shown that Dr. Brown did have knowledge of Plaintiff's complaint to Dr. Sokolosky in January 2018, the causal connection that would be established by Dr. Brown's purported knowledge would be invalidated due to the period of time between the complaint and the issuance of the First Remediation Plan. The Fourth Circuit has held that "a three-month period between the protected activity and the adverse action" is "too long" to "support a finding that there is a causal link." *Roberts*, 998 F.3d at 123, 127. Since the issuance of the First Remediation Plan occurred in December 2018, there would be approximately 11 months between the alleged protected activity and the adverse action, which is far too long for a causal link to exist under current Fourth Circuit precedent.[4]

Because there is no evidence in the record to demonstrate that Dr. Brown had knowledge that Plaintiff's complaints about Dr. Brown's actions concerned racial discrimination before the initiation of the First Remediation Plan, Plaintiff fails to satisfy the "causal connection" prong of a prima facie case for retaliation under *McDonnell Douglas*. Further, this Court concludes that the evidence Plaintiff attempts to offer as direct evidence of retaliation amounts only to conjecture. (*See* ECF No. 80 at 22–23.) Therefore, Plaintiff fails to establish that Dr. Brown's decision to place Plaintiff on the First Remediation Plan was retaliation under Title VI, Title VII, and § 1981.

---

[4] "In cases where 'temporal proximity between protected activity and allegedly retaliatory conduct is missing,' courts may look to the intervening period for other evidence of retaliatory animus,'" specifically "evidence of recurring retaliatory animus during the intervening period . . . ." *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)). Plaintiff points to one instance to support her assertion of recurring retaliatory conduct during the 11-month period. (*See* ECF No. 77-1 at 111:5-17 (Plaintiff's testimony that, in February 2018, Dr. Brown accused her of not responding to a page to perform a verification simulation, when, after it was investigated, it was discovered that Plaintiff never received a page).) Even if this was confirmed to be a retaliatory act, this one act is not sufficient to be considered evidence of recurring retaliatory animus.

15

2.      Purported Statements Made by Dr. Blackstock

Plaintiff next argues that purported statements made by Dr. Blackstock on a phone call with Dr. Thomas "intending to harm her professional prospects" constitutes her second claim of retaliation. (ECF No. 80 at 24.) More specifically, Plaintiff asserts that her April 25, 2019, appeal of the Notice of Deficiency was the protected activity that generated the phone call between Dr. Blackstock and Dr. Thomas in which the purported negative statements were made. (*Id.* at 25–26.) As Defendant's argue, Plaintiff's appeal of the Notice of Deficiency, with no accompanying complaint of race discrimination on the appeal, is not a protected activity. *See Thompson v. City of Charlotte*, 2018 WL 5085766, at *2 (W.D.N.C. Oct. 18, 2018), *aff'd*, 827 F. App'x 277. (4th Cir. 2020) ("As a general rule, general complaints of unfair treatment are not protected activity." (citations and internal quotation marks omitted)). Moreover, the additional evidence Plaintiff appears to rely on is the testimony of Dr. Jerry Jaboin, (*see* ECF No. 80 at 15–16), who was not a party to the call between Dr. Blackstock and Dr. Thomas, (ECF No. 81-4 at 126:22-24). The Court is unable to credit this testimony for several reasons. First, Dr. Jaboin has no personal knowledge of the call between Dr. Blackstock and Dr. Thomas, but states that Dr. Thomas discussed the call with him. (ECF No. 81-4 at 58:24–60:14, 125:8-16.) Second, none of the statements that Plaintiff attributes to Dr. Jaboin will cure the fact that Plaintiff has failed to establish the first prong of her prima-facie case under *McDonnell Douglas*. Nor can Dr. Jaboin's statements be used as direct evidence of racial animus. Many of the statements Plaintiff attributes to Dr. Jaboin are of his "impression" of Dr. Blackstock's thoughts and concerns on the call, (ECF No. 80 at 15), though he never spoke with Dr. Blackstock. Further, Dr. Thomas, who did participate in the phone call, has testified that he did not recall Dr. Blackstock describing Plaintiff as difficult or

16

discussing the fact that Plaintiff complained to Human Resources. (ECF No. 77-6 at 40:15–20.) In addition, Dr. Jaboin himself admitted in his testimony that he could not dispute Dr. Thomas' sworn account of Dr. Thomas' call with Dr. Blackstock and could not confirm the negative statements that Plaintiff claims were made on the call. (ECF No. 81-4 at 126:2–127:23.)

Finally, and perhaps of greatest import, most, if not all, of Dr. Jaboin's testimony about Dr. Blackstock's statements is nothing more than inadmissible hearsay under Federal Rules of Evidence 801(c) and 802, and "[h]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." *Lyons v. City of Alexandria*, 35 F.4th 285, 290 n.4 (4th Cir. 2022) (internal quotation marks omitted) (quoting *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991)). Thus, the Court may not consider Dr. Jaboin's testimony about Dr. Blackstock's statements on the call. As a result, Plaintiff is unable to satisfy the first prong of a prima facie case for retaliation under *McDonnell Douglas*, nor can these statements be used as direct evidence of racial or retaliatory animus.

In addition, Plaintiff argues that certain recorded statements of Dr. Blackstock serve as direct evidence of retaliation due to Plaintiff's appeal of the Notice of Deficiency. (ECF No. 80 at 26–27.) Plaintiff asserts that Dr. Blackstock told Plaintiff that "he was angry with her" for taking her complaints to Dr. Sokolosky and that he was not willing to sign off on her potential transfer to OHSU anymore. (*Id.*) However, the record contradicts this assertion. Plaintiff's own testimony is that Dr. Blackstock's recorded statements were not made in reference to OHSU. (ECF No. 77-1 at 208:20–209:25.) Plaintiff testified that Dr. Blackstock's statements were instead describing the fact that, now that others were involved in Plaintiff's residency, Dr. Blackstock no longer had the same control in his Department Chair position to

17

guarantee any particular outcome for Plaintiff. (*Id.*) As a result, with the evidence present in the record, Plaintiff has failed to establish that Dr. Blackstock retaliated against her for appealing the Notice of Deficiency under *McDonnell Douglas* as well as through direct evidence of retaliatory animus on the part of Dr. Blackstock.

Therefore, Defendants are entitled to summary judgment as to Plaintiff's claim for retaliation under Title VI, Title VII, and § 1981 against WFBMC.

## C. Title VI Discrimination Claim against WFBMC

Regarding Plaintiff's Title VI discrimination claim, Defendants argue that Plaintiff appears to have raised a claim of racial harassment under Title VI in one of her prior briefs. (ECF No. 77 at 40; *see* ECF No. 58 at 1–2.) Defendants argue in their Motion for Summary Judgment, however, that Plaintiff has not raised such a claim in the Second Amended Complaint. (ECF No. 77 at 40.) In response, Plaintiff provides no argument in her Brief in Opposition to Defendants' Motion for Summary Judgment regarding whether her Second Amended Complaint alleges harassment under Title VI, but instead highlights evidence that Plaintiff argues is sufficient to establish racial harassment in this case. (ECF No. 80 at 28–32.)

Plaintiff failed to include any mention of racial harassment in the Second Amended Complaint—in fact, the word "harassment" never appears in Plaintiff's Second Amended Complaint. (*See generally* ECF No. 22); *see Middlebrooks v. Univ. of Maryland*, 166 F.3d 1029, 1999 WL 7860, at *3 (4th Cir. Jan. 11, 1999) (unpublished) (table) (finding inadequate notice of a hostile environment claim where there was no mention of a hostile learning environment in amended complaints and "each claim alleges, in one form or another, 'disparate' treatment"). In addition, to reiterate, Plaintiff provides no argument on this motion regarding whether racial harassment was alleged in her Second Amended Complaint. The Court agrees with

Defendants that they "were afforded inadequate notice of" a claim of racial harassment by Plaintiff. *Id.*

To the extent that Plaintiff attempts to assert such a harassment claim in her briefing, the law in the Fourth Circuit is clear that a party cannot assert a new claim in this manner. *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing . . . ."). Because Plaintiff has failed to include any mention of racial harassment—and even failed to include the word "harassment" in her Second Amended Complaint—the Court concludes that Plaintiff has not alleged a harassment claim, and that the Court will not consider or further entertain such claim. *See Stewart v. Johnson*, 125 F. Supp. 3d 554, 561 (M.D.N.C. 2015).

With respect to Plaintiff's disparate treatment claim, the Fourth Circuit deploys "the familiar *McDonnell Douglas* test for claims of discrimination under Title VI." *Maisha v. Univ. of N. Carolina*, 641 F. App'x 246, 250 (4th Cir. 2016) (unpublished). Under this test, a plaintiff must first establish a prima facie case of discrimination by showing that the plaintiff is a "member[ ]of a protected class," that she "suffered an adverse action," and that "similarly situated individuals did not suffer the same adverse action[ ] in the same or similar situations." *Escobar v. Montgomery Cnty. Bd. of Educ.*, No. CIV. A. AW-99-1964, 2001 WL 98600, at *6 (D. Md. Feb. 1, 2001); *see also Ratliff v. Wake Forest Baptist Med. Ctr.*, No. 1:13CV991, 2014 WL 197809, at *2 (M.D.N.C. Jan. 14, 2014). If the plaintiff can demonstrate a prima facie case, and the defendant offers a legitimate, non-discriminatory reason for the adverse action, the plaintiff must then show that "the proffered reason" is pretext. *Middlebrooks*, 166 F.3d 1029, 1999 WL 7860, at *4.

Plaintiff's Title VI discrimination claim suffers from the same problem that ails her retaliation claim: Plaintiff cannot surmount the first hurdle of the *McDonnell Douglas* analysis that requires the establishment of a prima facie case. More specifically, here, there is no evidence in the record supporting the prong regarding "similarly situated individuals." In order to establish that an employee is similarly situated to a plaintiff, the plaintiff must establish that an employee "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (unpublished); *see also Holtz v. Jefferson Smurfit Corp.*, 408 F. Supp. 2d 193, 207 (M.D.N.C. 2006), *aff'd*, 242 F. App'x 75 (4th Cir. 2007) (holding no prima facie case of discrimination was established where the purported comparators "did not have a series of performance problems" similar to the plaintiff's). In her testimony, Plaintiff failed to identify a resident who attracted the same level of concern from faculty members regarding their performance. (ECF No. 77-1 at 220:23–221:1.)

Moreover, the evidence in the record that Plaintiff identifies as direct evidence of racial animus demonstrates alleged discrimination that is either not specific to Plaintiff or admitted by Plaintiff to be motivated by Dr. Brown's legitimate, non-discriminatory reasons. For instance, Plaintiff testifies that she never heard Dr. Brown make any comments about Plaintiff's race. (*Id.* at 65:7-9.) Also, though Plaintiff testifies that Dr. Brown heavily criticized another Black resident and an Egyptian resident, Plaintiff admitted that Dr. Brown's criticisms were all honest comments about those residents' performance. (*Id.* at 65:10–69:13.) Plaintiff also admits that she has no evidence to dispute what Dr. Brown reported other faculty members were telling Dr. Brown about Plaintiff's performance. (*Id.* at 61:1-9.) Further, the record shows that each decision about Plaintiff's residency was a collective decision that

20

involved the input of faculty members, recommendations of the CCC, and the meeting and discussion of an outside committee like PMAG. (*See, e.g.*, ECF Nos. 65 ¶¶ 7, 12; 66 ¶ 52; 65-6; 65-7; 65-8; 65-9; 65-2; 65-12 at 2–3.) Thus, the record does not support the notion that any of the decisions regarding Plaintiff's residency were motivated by discriminatory animus.

## IV.    CONCLUSION

Plaintiff has failed to provide sufficient evidence from which a reasonable juror could find in favor of Plaintiff and against Defendants on any of the remaining claims of retaliation or discrimination and, therefore, Defendants' Motion for Summary Judgment will be granted.

For the reasons stated herein, the Court enters the following:

**ORDER**

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment, (ECF No. 63), is **GRANTED**.

This, the 27th day of March 2024.

/s/ Loretta C. Biggs
United States District Judge
